**In re Freddy Jack BOWMAN, SSN: 459–96–4325, Gloria Ann Bowman, SSN: 173–48–1952, Debtors.**

**Central Rents, Inc., Movant.**

**Freddy Jack Bowman and Gloria Ann Bowman, Respondents.**

**Bankruptcy No. 95–1148–TUC–JMM. Contested Matter No. M95–396.**

United States Bankruptcy Court, D. Arizona.

Sept. 19, 1995.

Todd Jones, Tucson, AZ for Movant.

Freddy Jack Bowman and Gloria Ann Bowman, Tucson, AZ, pro se.

## MEMORANDUM DECISION

JAMES M. MARLAR, Bankruptcy Judge.

This Court has under advisement the motion filed by Central Rents, Inc. ("Central" or "movant") seeking relief from the automatic stays. A final hearing was conducted on September 18, 1995, at which time Todd Jones appeared for the movant, and the debtor Freddy Bowman appeared. Mrs. Bowman did not appear. The Court has considered the arguments of counsel, the evidence, and the entire file in this matter and now rules.

## I. *FACTS.*

The basic facts of this case are not in dispute. Between March 10, 1995, and April 14, 1995, the debtors rented two stereo systems, a kitchen set, and a television set from the movant. Each transaction was evidenced by a separate rental agreement on Central's standard form, copies of which were received in evidence (Ex. A, B, C, D). Almost immediately thereafter, the debtors defaulted on their lease obligations. On May 10, 1995, the debtors filed for relief under Chapter 13 of the Bankruptcy Code. The debtors have filed a plan which proposes to recharacterize the rental agreements as secured transactions and bifurcate the movant's claims into secured and unsecured portions. On July 13, 1995, Central Rents, Inc. filed its motion seeking relief from the automatic stays so that it could repossess the rental property. Movant has also asked that this case be dismissed as being filed in bad faith.

## II. *LEGAL DISCUSSION.*

### A. *Lease vs. Disguised Sale.*

Central to both the motion for stay relief and the proposed plan of reorganization is the character of the "rental agreements." The debtors contend that the agreements are in the nature of a disguised security agreement and, therefore, appropriately treated as a secured debt. Such treatment, if accurate, would make the Bowmans the owners of the property. The movant, on the other hand, contends that the agreements are true leases and capable only of being assumed or rejected pursuant to § 365. Such treatment, if legally correct, would make movant the owner. After thorough consideration of the matter, the Court must agree with the movant.

The resolution of this dispute begins with an examination of the Uniform Commercial Code as enacted in Arizona. Prior to 1992, the UCC defined a "security interest" as:

[A]n interest in personal property ... which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods ... is limited in effect to a reservation of a "security interest".... Unless a lease ... is intended as security, reservation of title thereunder is not a "security interest".... Whether a lease is intended as security is to be determined by the facts of each case; however: (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

A.R.S. § 47–1201(37) (1967) (amended 1990, 1992, and 1993). Under this provision, if a lessee is obligated to pay, over the term of the lease, the full purchase price of the property, the transaction is a disguised sale, regardless of its form. In contrast, if the lessee is not required to pay the full purchase price or if, to acquire ownership, the lessee must pay more than a nominal amount in order to exercise an option to purchase, the transaction is a "true" lease, rather than a sale. Although the decision did not involve Arizona law, the Ninth Circuit concluded in 1982 that a nominal purchase price at the end of the term is, as a matter of law, the

determining factor. *See In re J.A. Thompson & Son, Inc.,* 665 F.2d 941, 947 (1982).

If judged by this definition, the present agreements would have to be characterized as disguised sales capable of cram-down in a plan or reorganization. Central's standard Rental Purchase Agreement sets a weekly rental payment and provides for payments to be made over a period of weeks. If the debtors were to make all of the scheduled weekly payments they would own the property at the end of total lease term. They also have the option to purchase the property at a discount, by paying cash totalling 60% of the remaining lease payments due under the agreement. In other words, the lessee automatically owns the property at the end of the lease term without any additional cash outlay. Moreover, the risk of loss is completely shifted to the "lessee" during the term of the lease. The agreement provides that the lessee is fully responsible for the safety of the property until it is returned. The lessee bears the risk of loss or damage. These terms give the agreement the distinct flavor of a disguised sale.

 However, in 1992 the statutory definition of a "security interest" was dramatically changed to provide, in pertinent part, as follows:

> (a) Whether a transaction creates a lease or security interest is determined by the facts of each case. However, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the terms of the lease *not subject to termination by the lessee,* and: (i) the original term of the lease is equal to or greater than the remaining economic life of the goods; (ii) *the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;* (iii) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement; or (iv) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon com-

pliance with the lease agreement. (emphasis added)

A.R.S. § 47–1201(37). Under this definition, a transaction is a disguised sale if: (1) the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease *not subject to termination by the lessee;* and (2) one of the four conditions described in A.R.S. § 47–1201(37)(a) is met. These factors require the conclusion that the agreements in this case are true leases. Their redeeming feature is their term. Although it would appear at first blush that the term of the agreements is a period of several weeks, it is actually one (1) week with the following qualification:

> You are not obligated in any way to renew this agreement after the first rental period. However, you may renew this agreement weekly or monthly by making another payment before your paid term expires.

Thus, the lessee's obligation does not extend beyond one week and can be terminated and the property returned by the lessee with no further obligation. In light of this, this Court must conclude that this term removes the present contracts from the realm of disguised sales.

While there is apparently no Arizona case law to support this conclusion, the same conclusion has been reached in numerous other jurisdictions. *See generally, Powers v. Royce Rentals (In re Powers),* 983 F.2d 88 (7th Cir.1993) (construing Illinois law); *In re Allen,* 174 B.R. 293 (Bankr.D.Or.1994) (construing Oregon law); *Rent–A–Center, Inc. v. Mahoney (In re Mahoney),* 153 B.R. 174 (E.D.Mich.S.D.1992) (construing Michigan law); *In re Morris,* 150 B.R. 446, 449 (Bankr. E.D.Mo.1992) (construing Missouri law); *Rent–A–Center, Inc. v. Spears (In re Spears),* 146 B.R. 772 (Bankr.S.D.Ill.1992) (construing Illinois law); *In re Frady,* 141 B.R. 600 (Bankr.W.D.N.C.1991) (construing North Carolina law); *In re Taylor,* 130 B.R. 849 (Bankr.E.D.Ark.1991) (construing Arkansas law); *In re Mitchell,* 108 B.R. 166 (Bankr.S.D.Ohio 1989) (construing Ohio law). Given this conclusion, it follows that the present rental agreements are terminable leases

subject to Bankruptcy Code § 365, and not subject to cram-down in a chapter 13 plan.

In other words, the Bowmans are not the owners of the property.

### B. *Stay Relief.*

■ Pursuant to § 365, the debtors must either assume or reject the rental agreements. Because there has admittedly been a default under the agreements, the contracts may only be assumed if the debtors (1) cured the existing defaults; (2) compensate the movant for any actual pecuniary loss resulting from the defaults; and (3) provide adequate assurance of future performance under the rental agreements. 11 U.S.C. § 365(b)(1). Pursuant to § 365(d), a chapter 13 debtor may assume or reject an executory contract at any time before the confirmation of a plan. However, the court may fix a deadline for the debtor to assume or reject.

■ The movant alleges that there is cause to lift the stay due to the significant default on the agreements. On this point, this Court must agree. The movant further contends that the debtors are unable to cure the defaults and assume these leases. However, there is no evidence to support this contention, because the debtors have proceeded on the assumption that they are the owners of the property and that the agreements could be dealt with in their plan. Accordingly, rather than lifting the stay immediately, the Court finds that it is more equitable to give the debtors 14 days to determine whether they want to assume or reject these agreements. If they elect to assume the contracts, they must notify counsel for the movant, in writing, and cure all defaults by delivering good funds to counsel on or before the deadline. To satisfy the requirement of adequate assurance, the stay will be lifted, upon the expiration of 14 days after the date of this decision. If the debtors fail to timely cure the defaults and/or to make any of the regular weekly payments coming due after the entry of this decision, the movant will be free to pursue its state law remedies. In contrast, if the debtors fulfill their obligations under the agreements, they will be able to retain the rented property. This is a fair result for all.

### C. *Motion to Dismiss.*

■ Central has also alleged that this case was filed in bad faith and, therefore, should be dismissed. In support of this request Central cites *In re Eisen*, 14 F.3d 469 (9th Cir.1994) for the proposition that it is appropriate to dismiss a case where the debtor has (1) filed serial bankruptcy cases and (2) the second case was filed in response to creditor action. The Court does not read the *Eisen* case to stand for such a rule. In *Eisen* there was clear evidence that the debtor had concealed assets and mislead the court and creditors. There is no such evidence in this case. Admittedly, the good faith of these debtors is appropriately placed in question due to their serial filings and the uncomfortably close nexus between their execution of the rental agreements and the commencement of this case. However, the record is not sufficiently clear to allow such a ruling at this juncture. Thus, the motion to dismiss will be denied without prejudice.

### III. *RULING.*

Contemporaneously herewith, an Order consistent with this decision will be entered.